**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **JAMES W. DOYLE,** | |
| **Plaintiff,** | |
| **v.** | |
| **MITCHELL VIEIRA; JOHNATHAN HORVATH; MARK SCHMINK; EDITH SILVA; TOWN OF ROCKPORT; SARAH WILKINSON, DONALD CAMPBELL, JR. f/k/a DONALD AMODEO, RUTH GEORGE, PAUL MURPHY, and ROSS BRACKET as They Are Members of the ROCKPORT BOARD OF SELECTMEN; DONALD CAMPBELL, JR. f/k/a DONALD AMODEO, in his individual capacity; and SARAH WILKINSON, in her individual capacity,** | **COMPLAINT**<br><br>**CIVIL ACTION NO.:** |
| **Defendants.** | |

**INTRODUCTION**

This case involves the wrongful termination of Rockport's Fire Chief, Jimmy Doyle.

Jimmy had been a firefighter in the all-volunteer department for over forty-seven (47) years and

was only ten (10) months away from retirement when he was terminated after a ridiculing,

disparaging, and defamatory hearing held by the Board of Selectmen.

Leading up to this, for approximately twenty-four (24) months, the Board of Selectmen

created a situation in the Town of Rockport where a few individuals were illegally allowed to

consolidate power whilst receiving large salaries and stipends, for positions the Board of

Selectmen never had the authority to create and that were made in violation of Massachusetts

Law.  This situation, allowed Rockport's Town Administrator, Police Chief, and Assistant Police

Chief to act without parameters and to their benefit, but to the detriment of the Town's loyal public safety volunteers, specifically its Fire Chief. This complaint is lengthy and detailed, but it is necessary to explain how concerted activities by some Town Officials and the acquiescence of others, resulted in Chief Doyle's shameful termination.

## PARTIES

1.   Plaintiff James "Jimmy" Doyle ("Chief Doyle") resides at 92 High Street, Rockport, Massachusetts, and at all relevant times herein was and is a Citizen of the United States of America.

2.   Defendant Sarah Wilkinson resides at 23 Highview Road, Rockport, Massachusetts.

3.   Defendant Town of Rockport (the "Town" or "Rockport") is an independent municipality of Massachusetts, with a principal address at 34 Broadway, Rockport, Massachusetts.

4.   Defendant Sarah Wilkinson resides at 23 Highview Road, Rockport, Massachusetts, and is a Member of the Board of Selectmen.

5.   Defendant Donald Campbell, Jr. f/k/a Donald Amodeo resides at 5 King Street Court, Rockport, Massachusetts, and is a Member of the Board of Selectmen.

6.   Defendant Ruth George who resides at 86 Granite Street, Rockport, Massachusetts, and is a Member of the Board of Selectmen and its current Chairperson.

7.   Defendant Paul Murphy who resides at 21R Pleasant Street, Rockport, Massachusetts, and is a Member of the Board of Selectmen.

8.   Defendant Ross Brackett who resides at 27 Main Street, Rockport, Massachusetts, and is a Member of the Board of Selectmen.

9.   Defendant Mitchell Vieira is Rockport's Town Administrator ("Town Admin. Vieira") and resides at 8 Burley Farm Road, Danvers, Massachusetts.

10.     Defendant Jonathan Horvath is Rockport's Police Chief ("Police Chief Horvath") and resides at 0 Whale Cove Road, Rockport, Massachusetts.

11.     Defendant Mark Schmink is Rockport's Assistant Police Chief ("Asst. Police Chief Schmink") and resides at 6 Ocean Avenue, Rockport, Massachusetts.

12.     Defendant Edith Silva is a resident of Rockport, Massachusetts.

## FACTS

### Chief James "Jimmy" Doyle

13.     Chief Doyle was a volunteer firefighter with the Town of Rockport's Fire Department for forty-seven (47) years.

14.     Chief Doyle was a member of Rockport's Board of Engineers for over twenty-years.

15.     Chief Doyle was Rockport's Chief Fire Engineer ("Fire Chief") for over ten years, and received an annual stipend as Fire Chief of approximately $9,000.00 in 2020.

16.     Chief Doyle also served, in a capacity separate to his responsibilities and duties as Fire Chief, as Rockport's Fire Inspector for over twenty years.

17.     Rockport's Fire Inspector is a part-time (16-hr/wk) position (2020 salary was approximately $24,000.00).

18.     Chief Doyle has owned and operated J. Doyle Backhoe Service, a local excavation company, for over thirty years.

### Town of Rockport Government - Board of Engineers

19.     Rockport is governed by a legislative charter. *See* St. 1959, c. 242, and amendments at St. 1987, c. 619 and St. 1995, c. 133 (collectively the "Town Charter").

20.     The Town's legislative branch is a traditional open town meeting.

21.     The Town's executive consists of elected Board of Selectmen (the "Selectmen").

22.     The Town Charter vests the authorities and duties of the Rockport Fire Department ("RFD") with its Board of Engineers.

23.     The Town Charter grants authority to the Selectmen to appoint members to the Board of Engineers.

24.     The Board of Engineers' authority and duties are defined by Massachusetts Law.

25.     The Board of Engineers selects a Chief Fire Engineer/Fire Chief annually from its members in accordance with the Town Charter and Massachusetts Law.

26.     Chief Doyle was unanimously selected by the members of the Board of Engineers to serve as RFD's Fire Chief every year since 2010, through 2020.

27.     In accordance with the Town Charter and Massachusetts Law, the Board of Engineers, alone, have the following authorities:

    a.  to serve as fire wardens;

    b.  to exercise the powers and perform the duties of selectmen, in relation to the appointment of firefighters;

    c.  to establish policies and regulations for the RFD and its members; and

    d.  to maintain and control firefighting apparatuses and related equipment and buildings.

### *2019 – Illegal Disbanding of the Personnel Board and appointment of HR-Director*

28.     In late 2018 or early 2019, Town Admin. Vieira requested a legal opinion from Town Counsel on replacing the all resident-volunteer Personnel Board with a paid Human Resources Director ("HR-Director").

29.     Town Admin. Vieira does not have the authority to incur legal expenses on behalf of the Town, as the Board of Selectmen is vested with this authority in accordance with the Bylaws.

30. Town Counsel's opinion, in part, stated that having an HR-Director on staff instead of a Personnel Board made up of resident-volunteers was better, because an HR-Director would be required to comply with the Massachusetts Open Meeting Laws.

31. Based on Town Admin. Vieira's requested legal opinion, the Selectmen appointed Town Admin. Vieira as HR-Director, with an additional stipend (approximately $16,000/yr), in addition to his salary which he retained until some point in 2020.

32. The Personnel Board was illegally disbanded by the Selectmen and, in violation of the Town Charter and Bylaws.

33. The Selectmen replaced the all resident-volunteer Personnel Board with Town Admin. Vieira, as HR-Director.

34. At or around the same time, the Selectmen ceased assigning each other (members of the Board of Selectmen) to serve as liaisons with the Public Safety Departments, which they had previously always done.

35. Rockport's Personnel Regulations, which remain in full force and effect, have not been amended, which include the duties and responsibilities of the Personnel Board and the grievance policies and procedures for Town employees.

36. The Selectmen have created a situation where there is nothing in place which provides any Town employees with a means for a "fair and equitable resolution" for situations that affect the "welfare and/or working conditions" of Town employees, which the Personnel Regulations require.

### *2019 – Illegal Hiring of Police Chief's Spouse to Investigate Chief Doyle*

37. In the Spring of 2019, Town Admin. Vieira, acting under one of his unlawful authorities, received a complaint that Chief Doyle called another volunteer firefighter "a fucking

asshole" in the local ACE Hardware Store parking lot (not during Chief Doyle's Fire Inspector workday, and neither of the firefighters were on an active call at the time).

38.   Town Admin. Vieira confronted Chief Doyle at the Central Fire Station regarding the allegation, and Chief Doyle admitted to saying it and told Town Admin. Vieira that he believed this individual was in fact, "a fucking asshole," to which Town Admin. Vieira agreed with Chief Doyle, in the presence of one of the two Asst. Fire Chiefs.

39.   Even though Chief Doyle admitted to this verbal confrontation, Town Admin. Vieira, illegally hired Rockport Police Chief Jonathan Horvath's spouse, Attorney Dinamary Horvath, to conduct an internal investigation into the incident.

40.   The Police Chief's spouse, Attorney Dinamary Horvath investigated the allegations for several months, and was paid through the Town's legal budget.

41.   In June of 2019, Rockport Police Chief Horvath's spouse, Attorney Dinamary Horvath, in anticipation of conducting the decennial review of the by-laws in 2020, was appointed to the Town Government and Bylaw Committee.

42.   In June of 2019, Attorney Dinamary Horvath's investigation concluded, and Town Admin. Vieira (acting under one his unlawful authorities) presented Chief Doyle with a Last Chance Agreement ("LCA") to sign.

43.   The LCA pertains specifically to Chief Doyle's Fire Chief/Board of Engineer position, and not to his paid salary position as Fire Inspector.

44.   The LCA only pertains to the above incident.

45.   The LCA states that "any type of future misconduct will result an immediate hearing for termination of [Chief Doyle's] employment with the Town."

46.     The LCA was executed on behalf of the Town, by Town Admin. Vieira, without any

        legal authority to do so.

47.     The Selectmen never authorized Town Admin. Vieira to execute a LCA on their behalf

        unless they did so in violation of the Open Meeting Laws.

48.     Town Admin. Vieira's hiring of Police Chief Horvath's spouse's solo-practice law-firm,

        to conduct an internal investigation was unlawful, as the Selectmen have the sole

        authority to hire legal counsel for the Town.  Only the Selectmen can appoint Town

        Counsel or hire special counsel to assist Town Counsel.

49.     If the Selectmen did hire Attorney Horvath, they made that decision in violation of the

        Open Meeting Laws, as relevant public notices and meeting minutes during the

        surrounding timeframe are silent on the matter.

50.     The hiring of Attorney Horvath was done in secret by Town Admin. Vieira (acting under

        one of his illegal authorities) and not the Selectmen, so the public wouldn't know the

        Police Chief's spouse was getting paid to investigate members of the RFD.

51.     Town Admin. Vieira hiring Attorney Horvath to investigate the Fire Chief was unethical

        and in violation of the Massachusetts Conflict of Interest Law, as Attorney Horvath's

        husband, Police Chief Horvath's direct supervisor is Town Admin. Vieira.

52.     The Town is in violation of Massachusetts Conflict of Interest Law, as Attorney Horvath,

        at all relevant times herein, has had a known and obvious conflict:  while she was

        investigating Fire Chief Doyle, his direct supervisor was Asst. Police Chief Schmink who

        reports directly to Attorney Horvath's spouse, Rockport Police Chief Jonathan Horvath.

53. The Town is in violation of its own Bylaws, as it appointed Attorney Dinamary Horvath to the Town Government and Bylaw Committee in June of 2019, but members of this committee are not permitted to hold any other Town offices.

54. Town Admin. created a situation, where its employees had no separate and independent body or office to communicate their workplace concerns with, other than someone that is either directly or indirectly part of your chain of supervision.

55. It was a violation of the Town Charter and Massachusetts Law for Town Admin. Vieira (as HR-Director, Public Safety Commissioner, or Town Admin.) to discipline Chief Doyle, in any way.

56. To date, the Town has refused to provide Chief Doyle a copy of Attorney Horvath's 'internal investigation report.'

### *2019 – Illegal appointment of Public Safety Commissioner*

57. The Town Charter grants the Selectmen the option to appoint an "administrator or executive secretary," but it does not define either role.

58. The Town of Rockport Code of By-laws, approved by Annual Town Meeting on April 6, 2013 (the "Bylaws"); similarly, does not define administrator, or executive secretary, but does allow the Selectmen to appoint a Town Administrator, which it fails to define.

59. The Selectmen have hired a full-time Town Administrator for several years, at present the Town Administrator is Town. Adm. Vieira, who was appointed in June of 2019.

60. Prior to Town. Adm. Vieira's appointment, he was the Interim Town Administrator.

61. Prior to Interim Town Administrator, he was Assistant Town Administrator.

62. Prior to Assistant Town Administrator, he was Intern, for the Town of Rockport.

63.    Town Admin. Vieira's authorities and duties are not enumerated within the Bylaws; rather, they are included within his contract which was negotiated and executed between he and the Selectmen in executive session, (salary for the upcoming fiscal year is approximately $160,000.00).

64.    During the Town's search for a Town Administrator, at all relevant times, Town Admin. Vieira was also the Town's HR-Director.

65.    All of the applicants for the Town Administrator position went through Town Admin. Vieira, as HR-Director, who was also competing for the job.

66.    Eight (8) applications were received before the deadline of April 15, three applicants lacked the stated qualifications, and two were selected for interviews, but one withdrew "saying that the interim town administrator [Vieira] was very qualified for the position.

67.    A late applicant was received and was scheduled for an interview, but the late applicant withdrew as well. Vieira was the only remaining applicant.

68.    Town Admin. Vieira's contract, from June of 2019, illegally includes the duties and responsibilities of Public Safety Commissioner, in order to oversee all Public Safety functions (salary for the upcoming fiscal year is approximately $160,000.00).

69.    The Selectmen never obtained the legal authority, by a vote of Town Meeting, to appoint a Public Safety Commissioner, as required by Massachusetts Law.

70.    Town Admin. Vieira's purported authority as Public Safety Commissioner was and is illegal.

### *2019 – Illegal appointment of Emergency Services Director*

71.   In June of 2019, the Selectmen appointed Mark Schmink, then Rockport Police

      Department's first ever Lieutenant to be Rockport's first ever Assistant Police Chief and

      Rockport's first ever Emergency Services Director (ESD).

72.   Both positions did not exist before June of 2019, and he received a salary increase and

      additional stipend, respectively (salary for the upcoming fiscal year is approximately

      $123,000.00 in addition to two stipends for an additional $15,000.00).

73.   Neither position (Asst. Police Chief or ESD) was publicly advertised or offered to any

      other Town employee.

74.   In June of 2019, Asst. Police Chief Schmink illegally took over command of the

      Rockport Fire Department, both administratively and operationally.

75.   Asst. Police Chief Schmink was illegally placed in charge of the RFD, becoming the

      unlawful supervisor to both the Board of Engineers and Fire Chief Doyle.

76.   Asst. Police Chief Schmink has never been a firefighter and has no training or experience

      in firefighting.

77.   Asst. Police Chief Schmink's duties as illegal ESD, "under the direction of the Town

      Administrator," serving as illegal Public Safety Commissioner, include:

      a.   Supervising the Fire Department, "including recommending hiring, training,
           disciplining, and dismissal of employees."

      b.   Responsible for "fiscal responsibility for the [Fire] department including
           buildings, equipment, and staffing utilization."

      c.   "Organizes, directs and controls all resources to establish . . . tasks for all [Fire]
           personnel . . . including the . . . utilization of [Fire] department resources."

      d.   "Provides and oversees the organizational structure and employee performance . .
           . including . . . training, discipline, maintenance of equipment . . .."

     e.   "Provides information and reports regarding the [Fire Department's] activities and operations as required by the Town Administrator."

     f.   Responsible for communication with the public, media . . . related to all activities of the [Fire Department].

     g.   "Promulgates all General, Personnel, and Special Orders of the [Fire Department]."

78.    The Selectmen illegally granted authority to the Asst. Police Chief, with an extra stipend, which was more than double the Fire Chief's stipend.

79.    The authority and duties the Selectmen assigned to Asst. Police Chief Schmink are nearly identical to the authorities and duties of the Board of Engineers under the Town Charter and pursuant to Massachusetts Law.

80.    These various duties and authorities are expressly reserved for the Board of Engineers under the Town Charter and Massachusetts Law.

81.    In order for both the Public Safety Commissioner and Emergency Services Director positions to be legal, the Selectmen would first have to get approval by votes at the Town Meeting and the Town Charter would have to be amended.

82.    The Selectmen illegally made the Town's Board of Engineers and the Fire Chief subordinates of the Asst. Police Chief.

83.    Shortly after Asst. Police Chief Schmink's appointment, he held a meeting with the Board of Engineers and the four (4) Captains of the RFD, where he declared that 'within three years, I will make this a professional full-time department.'

### *Remainder of 2019 Through Early Fall of 2020*

84.    The Selectmen's illegal disbanding of the Personnel Board and appointment of Town Admin. Vieira as HR-Director, in conjunction with his purported authority as Public Safety Commissioner created a situation where employees, such as Chief Doyle, had no

one to go to with workplace concerns, other than their direct supervisor or someone in their supervisory chain.

85. Since the Personnel Board was illegally disbanded, the Town has not had any policies or procedures protecting its employees, as the Town's Personnel Regulations require a Personnel Board to be in place.

86. In June of 2019, Asst. Police Chief Schmink was appointed by Town Amin. Vieira to be the 'Chairmen of a search committee' to replace a retiring Board of Fire Engineer member (Asst. Fire Chief).

87. As 'Chairperson of the search committee,' Asst. Police Chief Schmink recommended to that the Selectmen appoint then Rockport Fire Department Captain Stephen Abell to the Board of Engineers.

88. In June of 2019, the Selectmen appointed Captain Abell to the Board of Engineers.

89. Asst. Fire Chief Abell is personal friends with Defendant Sarah Wilkinson.

90. Asst. Fire Chief Abell and Defendant Sarah Wilkinson routinely met to discuss the RFD and Chief Doyle, over the last several years.

91. The Selectmen created an illegal situation where all of the Town's public safety departments were under the authority of the Police Chief and Asst. Police Chief.

92. The Selectmen's illegal delegation of authorities violates the Town Charter and Massachusetts Law.

93. Eleven days after Asst. Police Chief Schmink illegally took over the RFD, he issued Chief Doyle written counseling for the following purported reasons:

   a. Chief Doyle did not respond to an illegal order of Asst. Police Schmink's to provide RFD personnel documentation to him by a certain deadline, which he had set for the day before he issued the written counseling.

     b.  Chief Doyle did not respond to an email regarding gym equipment that Asst. Police Chief Schmink was interested in acquiring.

     c.  Chief Doyle did not respond to an illegal order of Asst. Police Schmink's to provide additional RFD personnel documentation, which he had sent on a federal holiday one week earlier.

94.    Asst. Police Chief Schmink stated in the written counseling that Chief Doyle was recently "disciplined by the Town Administrator relative to an internal investigation," referring to the Police Chief's spouse, Attorney Horvath's internal investigation which resulted in the LCA.

95.    Asst. Police Chief Schmink "reduced [the above] to writing [in order for it to be] documented for consideration in the future as part of the potential for progressive discipline."

96.    It was a violation of the Town Charter and Massachusetts Law for Asst. Police Chief Schmink to discipline Chief Doyle, in any way.

97.    Asst. Police Chief Schmink has no legal authority to be privy to the contents of Chief Doyle's personnel file.

98.    Asst. Police Chief Schmink and Town Admin. Vieira, at all relevant times herein, beginning in June of 2019, usurped the Board of Engineers' and the Fire Chief's authority in violation of the Town Charter and Massachusetts Law:

     a.  Mandated that any training within the RFD required Asst. Police Chief Schmink's sole and express permission before hand;

     b.  Asst. Police Chief Schmink's took over all RFD disciplinary matters which has resulted in the termination of four firefighters; and numerous firefighters being placed on administrative leave;

     c.  Asst. Police Chief Schmink's ordered firefighters to work for the Board of Health (for free) giving out flu shots;

    d.   Asst. Police Chief Schmink's ordered Fire Chief Doyle to call him "Chief," after Fire Chief Doyle addressed him as "Director," an order Fire Chief Doyle refused to comply with;

    e.   Asst. Police Chief Schmink's made himself the sole authority for deciding if any fire apparatus could be operated (for training and/or maintenance); and

    f.   Asst. Police Chief Schmink's issued various unlawful orders to firefighters at active fire scenes.

99.    The Rockport Fire Department lost numerous volunteers, due to the poor morale created by Asst. Police Chief Schmink's illegal usurpation, and his illegal discipline of the firefighters.

100.    In the Spring of 2020, Asst. Police Chief organized hourly work opportunities for the public safety departments to conduct Board of Health "COVID-mask details" on Rockport's Bearskin Neck.

101.    The volunteer members of the RFD were to get paid approximately $18.00/hr., whilst the members of the Police Department were paid their overtime rate.

102.    The volunteer members of the RFD, who all have full-time jobs in addition to remaining on-call to respond to alarms, chose not to sign up for the Board of Health "COVID-mask details."

103.    Starting in the Spring of 2020, Asst. Police Chief Schmink retaliated against the RFD and its firefighters for not signing up to work Board of Health "COVID-mask details." by illegally preventing them to conduct any training for over eight (8) months.

104.    Fire Chief Doyle communicated his and the members of the RFD's concerns to Town Admin. Vieira numerous times, but he was ignored.

105.  Fire Chief Doyle, no longer having a Selectmen 'liaison' assigned to the RFD, communicated his and the RFD's concerns to the member of the Board of Selectmen who most recently held the liaison appointment, but he was ignored.

106.  Fire Chief James Doyle refused to take orders from Asst. Police Chief Schmink, as they were unlawful and placed the members of the RFD and the Town at risk, especially once Asst. Police Chief Schmink prevented the firefighters from training (which lasted over eight (8) months).

107.  After Fire Chief Doyle began refusing to comply with Asst. Police Chief Schmink's unlawful orders, Schmink began to issue orders directly to Asst. Fire Chief Abell, the newly appointed member of the Board of Engineers, usurping the lawful authority and organization of the Board of Engineers and Fire Chief Doyle.

108.  In the Summer of 2020, the Selectmen did not reappoint Fire Chief Doyle to the Board of Engineers, and he only remained in that position as a 'holdover;' despite, Town Admin. Vieira repeatedly telling Fire Chief Doyle that his 'appointment was delayed due to COVID.'

109.  There are no Selectmen meeting agenda items (executive or open session) which refer to any possible discussion held by the Selectmen pertaining to why Fire Chief Doyle was not reappointed.

110.  The Selectmen either violated the Open Meeting Law in discussing Chief Doyle's reappointment, or they never discussed it and Town Admin. Vieira did this *sua sponte*, without any legal authority to do so.

111.  In August of 2020, Asst. Police Chief Schmink illegally ordered the following from Chief Doyle:

    a. A comprehensive package which includes how many fire inspections you have conducted this year, and what you have submitted to the town for associated deposits for each. This should be a full accounting of the work conducted – not separated out by inspection – each inspection conducted at each residence and what the cost was. Include a breakdown of invoicing, appointments and time spent at each location. You are the Fire Chief 24/7 for recall and the fire inspector from 8 a.m. – 12 noon from Monday – Thursday. I need you to account for your time spent, daily and weekly in this area/ and if you are available, you should be conducting other managerial administrative duties . . .. This should be done on a word document, on your letterhead to the Director[1] and should be completed within the next two weeks. Any delay should be requested in writing in advance.

112. In September of 2020, Asst. Police Schmink notified Chief Doyle that the Town had hired an accountant to "review the administration of the Town's fire inspections."

113. Chief Doyle continued to press both Town Admin. Vieira and Asst. Police Chief Schmink to allow the RFD to train, but Asst. Police Chief Schmink would not permit the RFD to train until all its volunteer members complied with his unlawful orders and showed him a certain level of respect that only he believed, he deserved.

114. Asst. Police Chief Schmink and Town Admin. Vieira's illegal actions prevented the RFD from operating the way it is designed pursuant to the Town Charter and Massachusetts Law, negatively affecting the RFD's training and readiness, to the detriment of the Town's public safety.

115. Asst. Police Chief Schmink and Town Admin. Vieira further supplanted themselves in RFD's firefighter training process by creating unnecessary red tape which caused delays in gaining approval to send RFD members to the Massachusetts State Fire Academy.

116. Town Admin. Vieira mandated, for the first time ever, that RFD members applying to the Massachusetts State Fire Academy, had to have their medical physicals go through his office beforehand.

---

[1] Asst. Police Chief Schmink is referring to himself in the third person.

117.    Due to Town Admin. Vieira and Asst. Police Chief Schmink's involvement in the process, the RFD did not send any members to the Massachusetts State Fire Academy in 2020.

118.    Town Admin. Vieira and Asst. Police Chief Schmink deceptively blamed Chief Doyle for this.

119.    2020 was the first year Chief Doyle had been on the Board of Engineers, in more than twenty years, that the RFD did not send any members to the Massachusetts State Fire Academy.

120.    Based on the recommendations of Asst. Police Chief Schmink, Town Admin. Vieira illegally hired a third-party accountant to 'audit' the Fire Inspector's accounting records.

121.    Town Admin. Vieira hired the third-party accountant without the approval of the Selectmen.

122.    Town Admin. Vieira and Asst. Police Chief Schmink scheduled the third-party accountant to conduct his audit/review on October 7, 2020.

123.    Chief Doyle both was and remains qualified for the positions of Fire Chief and Fire Inspector.

124.    Chief Doyle met the Town's legitimate job performance expectations, as he conducted himself in the same manner, using the same process and procedures for more than twenty years as Fire Inspector and member of the Board of Engineers.

### *October 7, 2020*

125.    On October 7, 2020, the same day as the third-party accountant's audit/review of the Fire Inspector's records, Chief Doyle received a radio call on his Town issued VHF from Police Chief Horvath to immediately report to Rockport's Community House.

126. Rockport's Community House is a town building where Asst. Police Chief Schmink's office is located.

127. Chief Doyle immediately went to the Community House, where he was met by Police Chief Horvath and two Massachusetts State Police ("MSP") Troopers.

128. Chief Doyle was not given any notice of this meeting.

129. Chief Doyle was not given an option to meet with the MSP.

130. The two MSP Troopers had met with Police Chief Horvath and Asst. Police Chief Schmink that morning, before the MSP Troopers met with Chief Doyle, where they provided the MSP Troopers with purported background information on Chief Doyle.

131. The MSP asked Chief Doyle questions related to a report they received in which Defendant Edith Silva claimed Chief Doyle was stalking her.

132. The Troopers summarized Defendant Edith Silva's allegations, after speaking with her for "approximately two hours," with the below:

> She related numerous instances where she had crossed paths with Doyle while she was out for walks since the summer of 2018 . . . showed us pictures where Doyle's truck is parked at T-wharf which is across the water from her residence.

133. The Troopers noted that Chief Doyle "became visibly upset that **his everyday activities** could be causing anyone concern."

134. At the conclusion of the Troopers' interview, they informed Chief Doyle that there did not appear to be any issues of concern, and that they would advise Police Chief Horvath of their conclusion.

135. Shaken and distraught from the Troopers' interview, as well as Defendant Edith Silva's false accusations, Chief Doyle returned to Central Fire Station to conduct the recordkeeping audit/review with the third-part accountant.

136.    Immediately after meeting with Chief Doyle, the MSP Troopers met with both Police
        Chief Horvath and Asst. Police Chief Schmink, where the MSP Troopers "summarized
        [their] interview and told [them] that [the MSP Troopers] felt there was nothing criminal
        or improper with Doyle's actions."

137.    The MSP Troopers requested that the "case be closed."

138.    Police Chief Horvath and Asst. Police Chief Schmink, despite learning from the MSP
        Troopers that there "was nothing criminal or improper" with anything Chief Doyle did,
        immediately after Chief Doyle's interview with the MSP Troopers on October 7, 2020,
        did not notify Chief Doyle of the same.

139.    Due to Chief Doyle's unsettled state of mind following the MSP Troopers' interview, he
        underperformed during the recordkeeping audit/review, and during the weeks that
        followed.

140.    The accountant's report found that Chief Doyle's processes, which he used for over
        twenty (20) years as Fire Inspector without feedback or complaint, needed improved.

141.    Chief Doyle did not 'fail the audit.'

142.    This was the first time Chief Doyle was audited or told his processes were not sufficient,
        during his over-twenty (20) year tenure as Rockport's Fire Inspector.

143.    In the days and weeks after the MSP Troopers' interview, Chief Doyle repeatedly asked
        Police Chief Horvath, Asst. Police Chief Schmink, and Town Admin. Vieira for updates
        on the MSP Troopers' investigation, which they all failed to provide.

144.    For more than two weeks, Police Chief Horvath, Asst. Police Chief Schmink, and Town
        Admin. Vieira intentionally and purposefully kept Chief Doyle in the dark regarding the

MSP's finding that Defendant Edith Silva's accusations against him were baseless and their recommendation that the case be closed.

145. Beginning October of 2020, Chief Doyle suffered from severe emotional distress caused by Defendant Edith Silva's false accusations against him; this emotional distress would have been lessened if Police Chief Horvath, Asst. Police Chief Schmink, or Town Admin. Vieira had told Chief Doyle that the MSP concluded there was nothing improper immediately following the interview.

146. As a result of Chief Doyle's emotional distress, he suddenly felt that his job security was under constant threat.

147. Chief Doyle began experiencing flare-ups of his Multiple Sclerosis, due to the unnecessary stress he was under caused by Police Chief Horvath, Asst. Police Chief Schmink, and Town Admin. Vieira's manipulation of the situation, and Defendant Edith Silva's false accusations.

148. Over two weeks later on October 23, 2020, Chief Doyle was called to Town Admin. Vieira's office where he and Police Chief Horvath were waiting, to inform Chief Doyle that the MSP found "nothing criminal or improper" and that the MSP case was closed.

149. During the October 23, 2020, meeting, Town Admin. Vieira told Chief Doyle that he was not satisfied that the matter was closed, but provided no other information or explanation.

150. On November 9, 2020, after over eight (8) months of not being able to train, and countless other grievances between the members of the RFD and Asst. Police Chief Schmink, the volunteer firefighters sent a letter to the Selectmen, demanding:

    a. The removal of Asst. Police Chief Schmink from his ESD position and interference with the Boar of Engineers;
    b. the removal of Asst. Fire Chief Abell; and

  c. the return of the control of the fire department to the Board of Engineers and Fire Chief Doyle.

151. Fire Chief Doyle signed this letter along with most of the members of the RFD.

152. The members of the RFD threatened to turn in their gear on November 13, 2020, if their demands were not met.

153. The Firemen's letter dated November 9, 2020, made national, regional, and local news headlines.

154. The following morning, on November 10, 2020, Fire Chief Doyle's counsel submitted a Public Records Request (PRR) with the Town of Rockport, seeking records related to Chief Doyle, from and between, Town Admin. Vieira, Police Chief Horvath, Asst. Police Chief Shmink, Assistant Fire Chief Stephen Abell, and the Selectmen.

155. A few hours later, on November 10, 2020:

  a. Fire Chief Doyle was illegally placed on Administrative Leave by Town Admin. Vieira;

  b. Fire Chief Doyle was served an illegal 'No Trespass Order' for all Town property (signed by Town Admin. Vieira); and

  c. Town Admin. Vieira told Chief Doyle he had twenty-four (24) hours to retire, or he would be terminated.

156. Shortly after being served Town Admin. Vieira's illegal 'No Trespass Order,' which mandated that Chief Doyle obtain Town Admin. Vieira's permission before entering onto any Town property, Chief Doyle had to pick his grandchildren up at Rockport Elementary School.

157. Due the fear and distress he was placed under, Chief Doykle informed Town Admin. Vieira that he needed to pick up his grandchildren at school, and when Chief Doyle arrived, Board of Selectmen Chairperson Ruth George, Police Chief Horvath, and his

spouse, Attorney Horvath, were all standing together outside the elementary school to scrutinize Chief Doyle as he picked up his children.

158.   Town Admin. Vieira had no legal authority to place Chief Doyle on administrative leave without the Selectmen's authority, which he did not have.

159.   Town Admin. Vieira's impulsive response to the RFD's November 9, 2020, letter and Chief Doyle's PRR, was done in retaliation against Chief Doyle.

160.   Town Admin. Vieira's impulsive response to the RFD's November 9, 2020, letter and Chief Doyle's PRR, left the Town of Rockport without a Fire Chief, or a proper chain of command.

161.   Town Admin. Vieira did not even communicate his impulsive decisions to the Board of Engineers, specifically its senior member who then became Acting Chief of the RFD.

162.   Chief Doyle's administrative leave applied to both his salaried position as Fire Inspector, and his appointment on the Board of Engineers.

163.   Chief Doyle was not informed why he was being placed on Administrative Leave; rather he was told that he:

> "should expect further correspondence from [the Town Admin.] in the near
> future, identifying the Town's intent to invoke the termination clause in [his]
> 2019 Last Chance Agreement, and the charges upon which this action is based."

164.   That night, the Selectmen voted to go into executive session (*via* Zoom); citing the following reasoning: "to discuss the deployment of security personnel or devices, or strategies with respect thereto; votes may be taken."

165.   The meeting minutes of this Selectmen meeting have not been made public, in violation of the Open Meeting Laws and the Selectmen's own policies and procedures.

166.    Fire Chief Doyle, was given only 24-hours to make one of the biggest decisions of his life (the following day being a Holiday: Veterans Day, November 11, 2020).

167.    Town Admin. Vieira's oppressive 24-hour deadline was designed to place Chief Doyle under further duress, in efforts to force Chief Doyle to retire.

168.    Chief Doyle did not retire.

169.    The following week, on November 17, 2020, Chief Doyle's counsel submitted three additional PRRs, one of which sought records pertaining to the email encryption software ("Virtru") that Town Admin. Vieira, Police Chief Horvath, and Asst. Police Chief Schmink use to send encrypted emails to one another, including emails which pertain to Chief Doyle.

170.    Virtru, which Town Admin. Vieira purchased with Town funds, permits the encrypted emails to be stored with all the Town's emails in its 'vault,' but these emails remain encrypted.

171.    This process prevents the Town's Public Records Access Officer, who is not Town Admin. Vieira, from complying with the Massachusetts Public Records Laws, because the Public Records Access Officer cannot search the encrypted emails.

172.    The only method for searching the encrypted emails within the 'vault,' for public records or otherwise, is for the Virtru software's administrator to conduct the search.

173.    At all relevant times herein, Town Admin. Vieira was the Virtru software's administrator.

174.    That same day, on November 17, 2020, during the Selectmen's regularly scheduled meeting, the Selectmen acknowledged problems that were created by the Emergency Services Director position and immediately 'suspended' the position (which they created

in 2019), but not Asst. Police Chief Schmink or his additional pay ($20,000.00/yr stipend), for the illegal position.

175.     The Town charged Chief Doyle $1,800.00 in fees to comply with his four (4) Public Records Requests, which the Town required to be paid prior to issuing responses to any of the four (4) PRRs.

176.     The Town, after collecting $1,800.00, provided only four (4) documents in response, forcing Chief Doyle to appeal the Town's PRR responses to the Massachusetts Secretary of State ("Mass. Sec. of State").

177.     To date, Chief Doyle has yet to receive the emails he requested and paid for, including the encrypted emails under Town Admin. Vieira's exclusive control.

178.     On December 9, 2020, Chief Doyle's Undersigned Counsel received correspondence from Town Admin. Vieira to Chief Doyle, advising him that the Board of Selectmen had scheduled a hearing for December 17, 2020, to determine whether or not Chief Doyle would be terminated, which included a "Summary of Charges."

179.     In the letter, Town Admin. Vieira stated:

> You will recall that we met on October 23, 2020, in the presence of the Police Chief, and discussed another matter pertaining to you. At the end of that meeting and in the presence of the Police Chief, I stated to you that we needed to speak again about other pending matters. You asked me what those matters were and I informed you they were multiple performance issues and the failure of an audit associated with the Fire Inspection program.

180.     The day after Undersigned Counsel received Chief Doyle's Termination Letter, on December 10, 2020, over two-months after the Massachusetts State Police found that Chief Doyle did nothing improper and closed its investigation, Defendant Edith Silva submitted a Complaint for a Harassment Prevention Order against Chief Doyle with the Gloucester District Court.

181.    In her affidavit filed with the court, she claimed that Chief Doyle:

      a.   Had been stalking her;

      b.   appeared nearly everyday during her morning walks driving in the Rockport Fire
          Department SUV;

      c.   appeared in the post office when she was there;

      d.   claimed he parked on T-Wharf in order to look into her home located on Bear
          Skin Neck's Tuna Wharf[2]; and

      e.   claimed he parked on Atlantic Avenue in order to look into her home located on
          Bear Skin Neck's Tuna Wharf.[3]

182.    Defendant Edith Silva stated in her affidavit that on October 6, 2020, she filed a

complaint against Chief Doyle with the Essex County District Attorney's Office.

183.    Defendant Edith Silva failed to mention in her sworn affidavit that the MSP investigated

her claims and notified her two (2) months prior that the MSP found "nothing criminal or

improper with Doyle's actions" and that the case was closed.

184.    Defendant Edith Silva falsely stated in her sworn affidavit that the MSP Troopers "met

with Doyle and told him to stay away."

185.    The Troopers own letter stated that they "advise[d Chief Doyle] that ***he may want to*** go

in another direction if he sees [Defendant Edith Silva] walking."

186.    The Gloucester District Court denied Defendant's application for an Emergency *Ex Parte*

Harassment Prevention Order and scheduled a two-party hearing.

187.    On December 11, 2020, the day after receiving the Termination Letter, the Rockport

Police Department served Chief Doyle with a summons to appear for a hearing on

---

[2] These locations are approximately five hundred (500) feet away from each other.
[3] These locations are approximately one thousand (1000) feet away from each other.

Defendant Edith Silva's Complaint for a Harassment Prevention Order, scheduled for the day after his December 17, 2020, Termination Hearing, on December 18, 2020.

188.   Both the Termination Hearing and the Harassment Prevention Order Hearing were continued, due to scheduling conflicts.

189.   The Harassment Prevention Order Hearing was held on December 22, 2020, at Gloucester District Court.

190.   During the Hearing, the Gloucester District Court Presiding Justice asked Defendant Edith Silva if she knew anyone at the Rockport Police Department:

> Court: Do you know anybody on the Rockport Police Department?
> Silva: I met the -- I – I – I met the chief. But I didn't kn --
> Court: When did you meet the Chief?
> Silva: I met the Chief on – I emailed the Chief on September 30th. I called.
> . . .
> Court: Okay. Chief Horvath. Did you ever meet him or know him before
> September 30th, 2020?
> Silva: I did not.
> Court: Okay. So you sent him an e-mail.
> Silva: All right, I'm going to – I'm going to tell you exactly what happened. I --
> Court: But did you - -
> Silva: - - walked - - I - - I drove - -
> Court: Just hold on a minute. Did you - -
> Silva: Okay, I'm sorry.
> Court: - - send him an e-mail?
> Silva: I did. But prior to sending - -
> Court: Okay, but why - -
> Silva: -- him an e-mail - -
> Court: -- did you do that?
> Silva: Prior to sending him an e-mail, I actually walked into the police
> department.

191.   Defendant Edith Silva failed to mention, in her affidavit, that she met with Rockport Police Chief Horvath on October 2, 2020, and had spoken with him on the phone and communicated with him *via* email on separate occasions prior to that, in late September of 2020.

192.    Defendant Edith Silva also kept a log, beginning in April of 2020, of the times she purports to have encountered Chief Doyle, which she offered as evidence during the December 22, 2020, hearing.

193.    Defendants' log contains an entry on October 6, 2020, which states she "filed a complaint with state law enforcement."

194.    Defendants' log contains no mention of any meetings, telephone calls, or other communications with Rockport Police Chief Horvath.

195.    Defendant Edith Silva testified that Police Chief Horvath recommended that she file a complaint with the Essex County District Attorney's Office.

196.    The Gloucester District Court asked Defendant Edith Silva if she had any follow up with Police Chief Horvath, and she testified that she had a telephone call with him after filing the application for the Harassment Prevention Order, about a week before the December 22, 2020, hearing, on December 16, 2020.

197.    The Gloucester District Court found that there were only three (3) occasions that Defendant Edith Silva and Chief Doyle interacted, and that they were all in public places, during the daytime, where Chief Doyle would have a legitimate reason to be (in the post office, on a public street, and in a convenience store).

198.    The Gloucester District Court also found, that during all three of these interactions, Defendant Edith Silva was the one who initiated communications with Chief Doyle.

199.    The Gloucester District Court found that Chief Doyle never threatened, verbally threatened, or even engaged in conversation with Defendant Edith Silva.

200.   The Gloucester District Court found that Defendant Edith Silva "failed to present any credible or reliable evidence to meet the requirements of the statute under any theory" and denied her application.

### *Winter of 2021*

201.   On January 5, 2021, Selectmen Donald Campbell, Jr., f/k/a Donald Amodeo called one of Chief Doyle's best friends, John "Jack" Porter, who is a recently retired Asst. Fire Chief with the RFD.

202.   The only reason for Selectmen Campbell's call was to further threaten, intimidate, and pressure Chief Doyle to retire.

203.   Selectmen Campbell told Asst. Chief Porter that the issues with Chief Doyle were long-standing, went back years, and that there was a lot more information and evidence than what was included within Town Admin. Vieira's Termination Letter.

204.   Selectmen Campbell called Asst. Chief Porter because he knew it would get back to Chief Doyle.

205.   Defendant Town of Rockport failed to respond to a number of Public Records Requests (PRRs) during the month of November 2020, which Plaintiff appealed to the Mass. Sec. of State.

206.   During Mass. Sec. of State's appeal process, Chief Doyle was informed that his PRR Appeals had been closed by Mass. Sec. of State, because it was their "understanding that [Undersigned Counsel] received a response from [Town Counsel] Michele Randazzo . . .."

207.   Chief Doyle requested information from Mass. Sec. of State, on why the appeals were closed, and Mass. Sec. of State informed him that its office had communicated with Town Counsel Randazzo relating to the appeals, *ex parte*.

208.   Chief Doyle demanded to see a copy of the *ex parte* communications, as all Mass. Sec. of State's emails are public records, and the Mass. Sec. of State forwarded the *ex parte* email communications it had with Town Counsel Randazzo.

209.   The Mass. Sec. of State informed the Town of Rockport on January 14, 2021, (with Chief Doyle's counsel in copy) that two PRR Appeals had been filed and requested any additional information the Town may have by a certain date.

210.   On the same day, Town Counsel responded to Mass. Sec. of State with the following:

> Hi Barbara, maybe we can talk about these two new appeals, as well, when we talk tomorrow….
> Michele E. Randazzo, Esq.

211.   On January 25, 2021, Town Counsel Randazzo emailed Mass. Sec. of State, and her email included various attachments and other email communications between Town Counsel Randazzo and Chief Doyle's counsel.

212.   Town Counsel's emails sent to Mass. Sec. of State, *ex parte*, included confidential settlement discussions between Chief Doyle's Counsel and Town Counsel.

213.   Town Counsel's emails sent to Mass. Sec. of State, *ex parte*, included portions of Chief Doyle's Confidential Personnel File.

214.   Town Counsel's *ex parte* communications served absolutely no purpose, in resolving the PRR Appeals, other than an attempt to cast Chief Doyle (and his appeal) in a negative light with the Mass. Sec. of State.

*The Zoom Termination Hearing*

215. Town Admin. Vieira's Termination Letter included various 'charges' against Chief Doyle, and also stated that the "Scope of [the Termination Hearing was] limited to only disputing whether the charges identified [in the Termination Letter] occurred."

216. Prior to the Termination Hearing, Chief Doyle's undersigned counsel requested a copy of Chief Doyle's Job Descriptions, but the Town did not have either of his job descriptions on file.

217. The Town's Personnel Regulations mandates that the Personnel Board maintain job descriptions for every Town job.

218. The Selectmen disbanded the Personnel Board in 2018, in exchange for Town Admin. Vieira to serve as the HR-Director, which included an additional stipend.

219. Town Admin. Vieira claimed Chief Doyle did not maintain adequate records of the Fire Inspections, but Chief Doyle maintained both hard copies of the records and Microsoft Excel spreadsheets.

220. For over twenty years, Chief Doyle was the Town's Fire Inspector and maintained the records associated with his position in the same way every year, including in 2020.

221. Chief Doyle was never informed by the Town, in his more than twenty-year tenure, that his records were inadequate until October of 2020.

222. Town Admin. Vieira, in his Termination Letter, and Defendant Wilkinson, during the Termination Hearing, claimed that Chief Doyle failed the October 7, 2020, audit.

223. Chief Doyle did not fail the audit.

224. The only objective evidence Town Admin. Vieira and Asst. Police Chief Schmink conjured in relation to these charges was the following:

> Given that you accept cash payments for inspections, this failure to maintain adequate records of your inspections is particularly troubling, as there is simply no way for the Town to verify that you are turning over all cash payments made. Indeed, there is some evidence suggesting that you are not doing so. On average, over the past few years, you have turned over approximately $15,000-$16,000 per year in inspection and permit fees. In FY20, the total amount of fees reported and deposited by you was $13,410; however, you turned over only $200 in cash payments.

225.   The external third-party audit/review conducted on October 7, 2020, did not include the above information within its report.

226.   The evidence, which Town Admin. Vieira and Asst. Police Chief Schmink used to suggest there was money missing from Fire Inspections, completely disregards the COVID-19 State of Emergency which prompted the State Fire Marshall to cancel all fire inspections staring in March of 2020 through the end of the Fiscal Year 2020.

227.   The COVID-19 State of Emergency prevented fire inspections to be conducted, statewide, for more than 25% of Fiscal Year 2020, and Town Admin. Vieira and Asst. Police Chief deceptively tried to spin reality to make it look like Chief Doyle had committed a crime.

228.   Despite not being able to conduct inspections for more than 25% of the year, Chief Doyle reported amounts received that were approximately 10% less than the average of prior years.

229.   The Fire Inspection program, on average, collects only $200.00-$300.00 per year in cash payments because the vast majority of inspections conducted are performed at the request of real estate closing attorneys, real estate brokers/agents, or contractors.

230.   Town Admin. Vieira did not include this fact within his Termination Letter, in an effort to make it seem like Chief Doyle had committed a crime, when in fact far fewer inspections were performed in 2020 due to COVID-19..

231.    Town Admin. Vieira and Town Counsel, in November of 2020, repeatedly threatened
        Chief Doyle with threats of notifying law enforcement agencies, if their review of the
        Fire Inspector's records conclude that money is missing, causing Chief Doyle further
        emotional distress.

232.    During the Termination Hearing, Town Counsel admitted on record, as he
        contemporaneously acted as Town Admin. Vieira's prosecutor and the Selectmen's legal
        counsel, that no money was missing and that there is no allegation of any money missing.

233.    Chief Doyle's Fiscal Year 2020 numbers were accurate and correctly aligned with the
        budget.

234.    Town Admin. Vieira failed to mention that the October 7, 2020, audit report found that
        Chief Doyle maintained three manila folders with inspection records and excel
        spreadsheets.

235.    Chief Doyle requested that the hearing be held in open session and during the evening so
        the public could participate, and that the meeting's public notice include his name.

236.    Chief Doyle's Termination Hearing was re-noticed several times due to the Town of
        Rockport's inadequate public notices, as the Town refused to notice the meeting in
        accordance with the preceding paragraph, so the public would not know about the
        meeting.

237.    Eventually, the Town of Rockport issued proper public notice for Chief Doyle's
        Termination Hearing to be held on January 28, 2021, *via* Zoom videoconferencing.

238.    On January 28, 2021, Town Admin. Vieira used a Zoom license which could only
        accommodate 300 devices, but the Town attempted to conduct the Termination Hearing
        anyway as countless members of the public were stuck in the Zoom waiting room.

239.    The Termination Hearing had to be postponed until February 3, 2021, which was held *via*

Zoom videoconferencing (larger license capacity), and over 700 devices (members of the

public) were logged in to watch the Termination Hearing.

240.    At the outset of the Termination Hearing, the Chairmen Board of Selectmen, Defendant

Ruth George, refused to hear any of Chief Doyle's objections to the Termination Hearing

regarding:

   a.   The Town's violations of its own Personnel Regulations;
   b.   Any conflict and illegality issues related to the purported Last Chance Agreement; and
   c.   Any conflict issues with Town Counsel acting as Town Admin. Vieira's and Asst. Police Chief Schmink's "Prosecutor" against Chief Doyle (a Town Official who Town Counsel also represents) as he also played Judge advising the Selectmen on matters of law, during the Termination Hearing.

241.    The Selectmen allowed Town Counsel Darren Klein to spend nearly an hour slandering

Chief Doyle and inappropriately attacking his character, while Town Admin. Vieira kept

Chief Doyle and his counsel on mute (despite his Zoom-hand being raised), with no

ability to object.

242.    The Selectmen allowed Town Counsel Darren Klein to berate Chief Doyle for nearly an

hour on areas that were well outside the scope of the Termination Letter's 'charges.'

243.    Town Admin. Vieira did not place Town Counsel Klein on mute during Chief Doyle's

opportunity to speak, which allowed him to constantly interrupt and argue with Chief

Doyle's counsel.

244.    At the conclusion of the hearing, every member of the Board of Selectmen had pre-

prepared statements, which all but one read.

245.   All of the pre-prepared statements were in favor of terminating Chief Doyle, which the Selectmen prepared before they even heard from Chief Doyle or his counsel during the Termination Hearing.

246.   The pre-prepared statements included similar canned language regarding the Selectmen's fiduciary responsibilities, leaving them no choice but to terminate Chief Doyle.

247.   Defendant Wilkinson defamatorily claimed, in her pre-prepared statement, that Chief Doyle was a liar, a thief, and a cheat.

248.   Defendant Wilkinson falsely stated, in her pre-prepared statement that Chief Doyle failed the third-party audit/review conducted on October 7, 2020.

249.   Defendant Wilkinson falsely stated, in her pre-prepared statement that Chief Doyle "has provided no records and lied about having records," despite the audit findings otherwise.

250.   Chief Doyle did and does have the relevant records, and the Town was aware of these records.

251.   Chief Doyle never lied about having the records.

252.   Defendant Wilkinson defamatorily stated, in her pre-prepared statement that she had received numerous reports regarding various issues and alleged misconduct of Chief Doyle's over the years.

253.   Defendant Wilkinson failed to put any of these alleged reports in his Personnel File.

254.   Defendant Wilkinson has been a member of the Board of Selectmen for fifteen (15) years, and she voted in favor of his reappointment to the Board of Engineers each time it was before the Selectmen.

255.   The Town repeatedly notified Chief Doyle that due to the LCA, the scope of the Termination Hearing was limited to only if the allegations within the Termination

Letter's summary of charges occurred, but Town Counsel and the Selectmen repeatedly brought up past allegations, some many years before the LCA in attempt to defame Chief Doyle and cast him in a negative light.

256.   The past allegations that Defendant Sarah Wilkinson spoke about during the Termination Hearing were done in a deceptive and misleading way in attempt to defame Chief Doyle and cast him in a negative light.

257.   The Selectmen voted unanimously, after reading their pre-prepared statements, to terminate Chief Doyle on February 3, 2021, after forty-seven (47) years of service an only ten (10) months before he would reach mandatory retirement age (December of 2021).

### *Post Termination Hearing*

258.   On Saturday, February 5, 2021, an event to thank Chief Doyle was organized by a group of Town residents.

259.   Prior to the event, Chief Doyle was walking into a local convenience store when Asst. Police Chief Schmink walked out, and the two individuals exchanged words.

260.   Chief Doyle and his family, both local and out-of-state, as well as numerous other residents and volunteer firefighters gathered at "Five-Corners" in Rockport to thank him for his years of service to the Town.

261.   After the event, Chief Doyle and his family enjoyed a late lunch before his out-of-state family departed, and his local family members went home.

262.   Approximately thirty minutes after his family had left Chief Doyle's house, the same MSP Troopers that investigated Defendant Edith Silva's false allegations knocked on his door.

263.   Asst. Police Chief Schmink and Police Chief Horvath reported to the MSP Troopers that
       Chief Doyle threatened Asst. Police Schmink with a gun earlier in the day when the two
       crossed paths outside the convenience store.

264.   Chief Doyle has never owned a firearm.

265.   Prior to calling the MSP, Asst. Police Chief Schmink led an investigation into his own
       false report which included ordering Rockport Police Officers and Town IT Personnel to
       compile video recordings around the area of the convenience store.

266.   The MSP Troopers were satisfied that Chief Doyle did not threaten Asst. Police Chief
       Schmink with a gun as Chief Doyle told them what he did say:

           'I've heard rumors that you [i.e., Schmink] held someone hostage at gunpoint
           when you were a Sheriff . . ..'

267.   Chief Doyle was referring to an incident that occurred when Asst. Police Chief Schmink
       was with the Essex County Sheriff's Department before he was a Rockport Police
       Officer.

268.   This unnecessary, unjustified, and unlawful event caused further emotional distress to
       Chief Doyle following the false accusations made by Defendant Edith Silva in October of
       2020.

### Count I
### First Amendment Violation – 42 U.S.C. § 1983
*Chief Doyle v. Defendants Vieira, Schmink, Town, and Selectmen*

269.   Plaintiff incorporates the preceding paragraphs as if they were expressly stated herein.

270.   Public employees are protected from retribution for their speech or their association with
       others when their statements or conduct addresses a matter of public concern.

271.  Chief Doyle's statements, including but not limited to the letter he signed and sent to the Selectmen on November 9, 2020, concerned a matter of public concern, the Rockport Fire Department.

272.  The matters he discussed were of legitimate local, regional, and national news interest, and the subject of general interest and of value and concern to the public at the time.

273.  Defendants had no cognizable interest in preventing Chief Doyle from exercising his free speech rights, for the sake of an effective or efficient public service, as the matters he discussed concerned the defendants illegal and unlawful interference with the operation of the volunteer Rockport Fire Department.

274.  Defendants engaged in adverse conduct against Chief Doyle, in retaliation of his protected speech, by placing him on administrative leave the day after the Rockport Fire Department's November 9, 2020, letter was sent to the Selectmen and hours after he submitted a Public Records Request with the Town, ultimately terminating Chief Doyle.

275.  As a direct and proximate result of Defendants actions, Chief Doyle has suffered serious and substantial injury and loss, including loss of reputation, indignity, mental suffering and distress, inconvenience and expenditure of time in defending litigation, attorneys' fees and costs incurred, loss of money, and loss of his employment with the Town of Rockport.

**Count II**
**Violation of the Massachusetts Civil Rights Act - G.L. c. 12, § 11I**
*Chief Doyle v. Defendants Vieira, Schmink, Town, and Selectmen*

276.  Plaintiff incorporates the preceding paragraphs as if they were expressly stated herein.

277.  Public employees are protected from retribution for their speech or their association with others when their statements or conduct addresses a matter of public concern.

278.  Chief Doyle's statements, including but not limited to the letter he signed and sent to the Selectmen on November 9, 2020, concerned a matter of public concern, the Rockport Fire Department.

279.  The matters he discussed were of legitimate local, regional, and national news interest, and the subject of general interest and of value and concern to the public at the time.

280.  Defendants had no cognizable interest in preventing Chief Doyle from exercising his free speech rights, for the sake of an effective or efficient public service, as the matters he discussed concerned the defendants illegal and unlawful interference with the operation of the volunteer Rockport Fire Department.

281.  Defendants engaged in adverse conduct against Chief Doyle, in retaliation of his protected speech, by placing him on administrative leave the day after the Rockport Fire Department's November 9, 2020, letter and hours after he submitted a Public Records Request, ultimately terminating Chief Doyle.

282.  As a direct and proximate result of Defendants actions, Chief Doyle has suffered serious and substantial injury and loss, including loss of reputation, indignity, mental suffering and distress, inconvenience and expenditure of time in defending litigation, attorneys' fees and costs incurred, loss of money, and loss of his employment with the Town of Rockport.

### Count III - Wrongful Termination in Violation of Public Policy
### (For doing what the law requires, not doing what the law forbids)
*Chief Doyle v. Defendants Vieira, Schmink, Town, and Selectmen*

283.  Plaintiff incorporates the preceding paragraphs as if they were expressly stated herein.

284.  Defendants wrongfully terminated Chief Doyle in violation of public policy.

285.   Defendants repudiated against Chief Doyle for refusing to comply with Town Admin. Vieira and Asst. Police Chief Schmink's various unlawful orders.

286.   Chief Doyle's conduct is protected by well-defined public policy.

287.   Defendants repudiated against Chief Doyle for his continued attempts to maintain administrative and operational control of the Rockport Fire Department in accordance with the Town Charter and Massachusetts Law,

288.   It is a violation of public policy to terminate a municipal employee who does what the law requires, but not what the law forbids.

289.   As a direct and proximate result of Defendants actions, Chief Doyle has suffered serious and substantial injury and loss, including loss of reputation, indignity, mental suffering and distress, inconvenience and expenditure of time in defending litigation, attorneys' fees and costs incurred, loss of money, and loss of his employment with the Town of Rockport.

### Count IV - Wrongful Termination in Violation of Public Policy
#### (Reporting violations of public safety laws)
*Chief Doyle v. Defendants Vieira, Schmink, Town, and Selectmen*

290.   Plaintiff incorporates the preceding paragraphs as if they were expressly stated herein.

291.   Defendants wrongfully terminated Chief Doyle in violation of public policy.

292.   Defendants repudiated against Chief Doyle after he reported circumstances that he reasonably and in good faith believed violated Commonwealth of Massachusetts public safety laws and presented a threat to public safety.

293.   Defendants violated public policy in violation of state and municipal law and fire ordinances, and when Chief Doyle reported this to the Selectmen, Defendants retaliated against him.

294. Defendants repudiated against Chief Doyle for his continued attempts to maintain administrative and operational control of the Rockport Fire Department in accordance with the Town Charter and Massachusetts Law, which is conduct protected by well-defined public policy.

295. As a direct and proximate result of Defendants actions, Chief Doyle has suffered serious and substantial injury and loss, including loss of reputation, indignity, mental suffering and distress, inconvenience and expenditure of time in defending litigation, attorneys' fees and costs incurred, loss of money, and loss of his employment with the Town of Rockport.

**Count V - Retaliation – G.L. c. 149, § 185**
*Chief Doyle v. Defendants Vieira, Schmink, Town, and Selectmen*

296. Plaintiff incorporates the preceding paragraphs as if they were expressly stated herein.

297. At all times relevant herein, Chief Doyle was a public-sector employee.

298. Defendants took action against Chief Doyle in retaliation for providing information to his purported supervisors and the Board of Selectmen, relating to activities, policies, or practices that Chief Doyle reasonably believes were in violation of law.

299. Defendants took action against Chief Doyle in retaliation for providing information to his purported supervisors and the Board of Selectmen, relating to activities, policies or practices that Chief Doyle reasonably believes posed a risk to public health and safety.

300. Defendants took action against Chief Doyle in retaliation for refusing to participate in activities, policies, and practices that Chief Doyle reasonably believes were in violation of law.

301.   Defendants took action against Chief Doyle in retaliation for refusing to participate in activities, policies, and practices that Chief Doyle reasonably believes posed a risk to public health and safety.

302.   Defendants took action against Chief Doyle in retaliation for him notifying the Town Administrator and the Board of Selectmen regarding Asst. Police Chief Schmink's illegal interference with the Rockport Fire Department.

303.   Defendants took action against Chief Doyle in retaliation for him notifying the the Town Administrator and the Board of Selectmen that the circumstances were negatively affecting the morale of the Rockport Fire Department, resulting in loss of membership.

304.   Defendants took action against Chief Doyle in retaliation for him notifying the the Town Administrator and the Board of Selectmen that Asst. Police Chief Schmink's illegal interference with the Rockport Fire Department prevented the Rockport Fire Department from training, which presented public safety concerns.

305.   As a direct and proximate result of Defendants actions, Chief Doyle has suffered serious and substantial injury and loss, including loss of reputation, indignity, mental suffering and distress, inconvenience and expenditure of time in defending litigation, attorneys' fees and costs incurred, loss of money, and loss of his employment with the Town of Rockport.

### Count VI - Malicious Prosecution
*Chief Doyle v. Defendant Edith Silva*

306.   Plaintiff incorporates the preceding paragraphs as if they were expressly stated herein.

307.   By filing her Complaint for a Harassment Prevention Order, Defendant Edith Silva initiated and used legal process against Chief Doyle.

308.   Defendant Edith Silva initiated and used legal process without probable cause to believe in the validity of her claim.

309.   The legal process initiated and used by Defendant Edith Silva with an improper purpose and without probable cause was legally and finally terminated in Chief Doyle's favor.

310.   Defendant Silva initiated the civil proceeding against Chief Doyle with malice or for improper purpose and without probable cause.

311.   As a direct and proximate result of Defendant's actions, Chief Doyle has suffered serious and substantial injury and loss, including loss of reputation, indignity, mental suffering and distress, inconvenience and expenditure of time in defending litigation, attorneys' fees and costs incurred, loss of money, and loss of his employment with the Town of Rockport.

### Count VII - Abuse of Process
*Chief Doyle v. Defendant Edith Silva*

312.   Plaintiff incorporates the preceding paragraphs as if they were expressly stated herein.

313.   By filing her Complaint for a Harassment Prevention Order and continuing to prosecute it before the Gloucester District Court issued a Directed Verdict in favor of Chief Doyle, Defendant Edith Silva filed a baseless action against Chief Doyle for the purpose of damaging Chief Doyle.

314.   Defendant Edith Silva's actions described above, including but not limited to its initiation of a baseless action against Chief Doyle for ulterior or illegitimate purposes, and its perpetuation of said baseless action constitute a tortious abuse of process.

315.   As a direct and proximate result of Defendant's actions, Chief Doyle has suffered serious and substantial injury and loss, including loss of reputation, indignity, mental suffering and distress, inconvenience and expenditure of time in defending litigation, attorneys'

fees and costs incurred, loss of money, and loss of his employment with the Town of Rockport.

### Count VIII - Defamation
*Chief Doyle v. Defendant Edith Silva*

316.  Plaintiff incorporates the preceding paragraphs as if they were expressly stated herein.

317.  Defendant Silva published false statements about Chief Doyle, to at least one Rockport Town Official, the Massachusetts State Police, and in open court.

318.  Defendant Silva published false statements were relied upon to wrongfully terminate Chief Doyle.

319.  Defendant Silva published false statements, accusing Chief Doyle of criminal conduct.

320.  Defendant Silva published false statements which prejudiced Chief Doyle's business.

321.  Defendant Silva published false statements which prejudiced Chief Doyle's personal and private business.

322.  Defendant Silva's statements were made maliciously, recklessly, and with ill will towards Chief Doyle.

323.  Defendant Silva knew her statements were false at the time she made them.

324.  Defendant Silva's statements were made with a reckless disregard for the truth.

325.  As a direct and proximate result of Defendants actions, Chief Doyle has suffered serious and substantial injury and loss, including loss of reputation, indignity, mental suffering and distress, inconvenience and expenditure of time in defending litigation, attorneys' fees and costs incurred, loss of money, and loss of his employment with the Town of Rockport.

## Count IX - Unlawful Detention

*Chief Doyle v. Defendants Police Chief Jonathan Horvath and Town*

326.   Plaintiff incorporates the preceding paragraphs as if they were expressly stated herein.

327.   This count arises under the 4th and 14th Amendments to the United States Constitution and under Title 42. U.S.C. § 1983.

328.   This court has jurisdiction of this action pursuant to Title 28, U.S.C. § 1983.

329.   At all relevant times herein, each and all of the acts of Defendant Police Chief Horvath alleged herein, were done by him under the color and pretense of the statutes, regulations, customs and usages of the Commonwealth of Massachusetts and under the authority of his office of Police Chief for the Town of Rockport.

330.   On October 7, 2020, at approximately 9 a.m. and while Chief Doyle was at work for the Town of Rockport as its Fire Inspector and on-call Fire Chief located at Rockport's Central Fire Station, Defendant Police Chief Horvath called him on his fire department issued hand-held radio and demanded that he report to the Rockport Community House (a Town owned building where Asst. Police Chief Schmink has his office) but did not provide any reason.

331.   Chief Doyle reasonably presumed that his presence was required at the Community House, in his official capacity of Fire Inspector or Fire Chief.

332.   Chief Doyle, reported to the Community House under false pretenses, presuming his presence was required as Rockport's Fire Chief, and upon entering Defendant Police Chief Horvath seized Chief Doyle, without prior notice or consent, where he was unlawfully detained under the direction of Defendant Police Chief Horvath.

333.   Chief Doyle was unlawfully detained, without warrant, and without probable cause to be interrogated by the Massachusetts State Police, under the direction of Defendant Police Chief Horvath.

334.   No criminal charges were ever filed against Chief Doyle in connection with or in support of Defendant Police Chief Horvath's unlawful detention to which Chief Doyle was subjected.

335.   Police Chief Horvath's detention of Chief Doyle was intentional and unjustified.

336.   Police Chief Horvath's detention was purportedly to conduct an investigation, which was never warranted.

337.   The acts of the defendant herein were done with the purpose and intent of depriving Chief Doyle of his right to be free from unreasonable seizure secured to him under the Fourth Amendment to the United States Constitution and of his right not to be deprived of liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

338.   The acts and conduct of Defendant Police Chief Horvath were performed knowingly, intentionally and maliciously, by reason of which Chief Doyle is entitled to punitive damages.

339.   As a direct and proximate result of Defendant's actions, Chief Doyle has suffered serious and substantial injury and loss, including loss of reputation, indignity, mental suffering and distress, inconvenience and expenditure of time in defending litigation, attorneys' fees and costs incurred, loss of money, and loss of his employment with the Town of Rockport.

## Count X - Defamation
*Chief Doyle v. Defendant Wilkinson, in her individual capacity*

340.   Plaintiff incorporates the preceding paragraphs as if they were expressly stated herein.

341.   Defendant Wilkinson published false statements which were relied upon to wrongfully terminate Chief Doyle.

342.   Defendant Wilkinson published false statements, accusing Chief Doyle of criminal conduct.

343.   Defendant Wilkinson published false statements which prejudiced Chief Doyle's personal and private business.

344.   Defendant Wilkinson's statements were not made with any legitimate interest of the Town of Rockport.

345.   Defendant Wilkinson's statements were made maliciously, recklessly, and with ill will towards Chief Doyle.

346.   Defendant Wilkinson knew her statements were false at the time she made them.

347.   Defendant Wilkinson made no attempt to verify the truth of her statements, before making them.

348.   Defendant Wilkinson's statements were made with a reckless disregard for the truth.

349.   Defendant Wilkinson's defamatory statements do not qualify for any immunity offered to elected officials in the Commonwealth of Massachusetts.

350.   As a direct and proximate result of Defendant's actions, Chief Doyle has suffered serious and substantial injury and loss, including loss of reputation, indignity, mental suffering and distress, inconvenience and expenditure of time in defending litigation, attorneys' fees and costs incurred, loss of money, and loss of his employment with the Town of Rockport.

**Count XI - Defamation**
*Chief Doyle v. Schmink*

351.   Plaintiff incorporates the preceding paragraphs as if they were expressly stated herein.

352.   Asst. Police Chief Schmink published false statements about Chief Doyle, to other Rockport Town Officials and the Massachusetts State Police.

353.   Asst. Police Chief Schmink published false statements, accusing Chief Doyle of criminal conduct.

354.   Asst. Police Chief Schmink published false statements which prejudiced Chief Doyle's personal and private business.

355.   Asst. Police Chief Schmink's statements were made maliciously, recklessly, and with ill will towards Chief Doyle.

356.   Asst. Police Chief Schmink knew his statements were false at the time he made them.

357.   Asst. Police Chief Schmink's statements were made with a reckless disregard for the truth.

358.   As a direct and proximate result of Defendant's actions, Chief Doyle has suffered serious and substantial injury and loss, including loss of reputation, indignity, mental suffering and distress, inconvenience and expenditure of time in defending litigation, attorneys' fees and costs incurred, loss of money, and loss of his employment with the Town of Rockport.

**Count XII - Intentional Infliction of Emotional Distress**
*Chief Doyle v. Defendants Vieira, Horvath, Schmink, Silva, Campbell, and Wilkinson*

359.   Plaintiff incorporates the preceding paragraphs as if they were expressly stated herein.

360.   Defendants acted in an extreme and outrageous manner.

361.   Defendants intended to cause emotional distress or knew or should have knows that emotional distress was likely to occur.

362.   The defendants' actions were intentionally designed to cause Chief Doyle distress, so that he would retire.

363.   The emotional distress Chief Doyle endured, was severe and of a nature that no reasonable person could be expected to endure.

364.   The defendants' actions resulted in Chief Doyle's distress, which include grief, sleeplessness, anxiety, and depression.

365.   As a direct and proximate result of Defendants actions, Chief Doyle has suffered serious and substantial injury and loss, including loss of reputation, indignity, mental suffering and distress, inconvenience and expenditure of time in defending litigation, attorneys' fees and costs incurred, loss of money, and loss of his employment with the Town of Rockport.

### Count XIII - Negligent Hiring, Retention, and Supervision
*Chief Doyle v. Defendants Vieira, Town, and Selectmen*

366.   Plaintiff incorporates the preceding paragraphs as if they were expressly stated herein.

367.   The Town of Rockport negligently hired, retained, and paid for Town Admin. Vieira to illegally serve as Public Safety Commissioner.

368.   The Town of Rockport negligently hired, retained, and paid for Asst. Police Chief Schmink to illegally serve as Emergency Services Director.

369.   Both Town Admin. Vieira and Asst. Police Chief Schmink were assigned to these positions with duties and responsibilities for which they had no previous experience or training.

370.   The Town's aforementioned negligent hiring, retention, and assignments resulted in the Town wrongfully terminating Chief Doyle.

371.   As a direct and proximate result of Defendants actions, Chief Doyle has suffered serious and substantial injury and loss, including loss of reputation, indignity, mental suffering and distress, inconvenience and expenditure of time in defending litigation, attorneys' fees and costs incurred, loss of money, and loss of his employment with the Town of Rockport.

### Count XIV- Breach of Contract – Personnel Regulations
*Chief Doyle v. Defendants Vieira, Town, and Selectmen*

372.   Plaintiff incorporates the preceding paragraphs as if they were expressly stated herein.

373.   Rockport's Personnel Regulations were an express contract between the Town and Chief Doyle.

374.   The Personnel Regulations state "[t]he Town shall protect the rights and duties of the employees as stated in these Regulations."

375.   Chief Doyle was entitled to each and every right that the Personnel Regulations provided to him.

376.   The Town never amended the Personnel Regulations, in fact the Personnel Regulations were provided to Chief Doyle by Town Counsel in preparation for his Termination Hearing.

377.   The Town could not have amended the Personnel Regulations, as it illegally disbanded the Personnel Board.

378.   The Town cannot unilaterally modify the Personnel Regulations, by its own language.

379.   The Town violated its Personnel Regulations as it never conducted annual performance reviews as required by its own Personnel Regulations.

380.    The Town shall protect the rights and duties of the employees as stated in these Regulations.

381.    The Personnel Regulations contain grievance procedures but require the Personnel Board in order to hear said grievance.

382.    The Selectmen and Town Admin. Vieira unlawfully disbanded its Personnel Board; thus there was no Personnel Board to hear Chief Doyle's grievance.

383.    As a direct and proximate result of Defendants actions, Chief Doyle has suffered serious and substantial injury and loss, including loss of reputation, indignity, mental suffering and distress, inconvenience and expenditure of time in defending litigation, attorneys' fees and costs incurred, loss of money, and loss of his employment with the Town of Rockport.

## Count XV - Declaratory Judgment
*Chief Doyle v. Defendants Vieira, Town, and Selectmen*

384.    Plaintiff incorporates the preceding paragraphs as if they were expressly stated herein.

385.    This court has jurisdiction pursuant to G.L. c. 231A § 1.

386.    An actual controversy exists between the plaintiff and the defendants, as to whether or not the purported Last Chance Agreement is a valid contract.

387.    Such controversy is ripe for a resolution by the court.

388.    Chief Doyle seeks a Declaratory Judgment pursuant to G.L., c. 231A, declaring that the Last Chance Agreement is *void ab initio* and legally invalid.

389.    The purported Last Chance Agreement was made in violation of the relevant statutes and regulations that Chief Doyle and the Town were subject to and prohibited the Last Chance Agreement from happening in the first instance.

390.    Declaring the Last Chance Agreement as *void ab initio* is necessary to accomplish the statutory purpose.

## Count XVI - Wrongful Termination – No Just Cause
*Chief Doyle v. Defendants Vieira, Town, and Selectmen*

391.    Chief Doyle's Termination was not for good-cause, and it resulted in the loss of salary, reputation, time in service, and the unlawful cancelling of his health insurance benefits.

392.    The Selectmen had no reasonable basis for being dissatisfied with Chief Doyle's job performance.

393.    Chief Doyle did not commit any misconduct.

394.    Defendants acted in bad faith by terminating Chief Doyle in an attempt to make him the scape goat for their illegal mismanagement of the Town and its resources.

395.    Defendants unlawfully assigned new supervisors for Chief Doyle, who were biased and acted in bad faith.

396.    The Selectmen adopted and assumed the animus towards Chief Doyle, which his unlawful supervisors have towards him.

397.    Chief Doyle was constantly harassed by his illegally appointed supervisor, Asst. Police Chief Schmink, to produce various computer-generated documents that Asst. Police Chief Schmink had no legal authority demanding.

398.    For more than twenty (20) years, Chief Doyle performed as Fire Inspector and member of the Board of Engineers, before Asst. Police Chief Schmink was illegally appointed as his supervisor.

399.    Asst. Police Chief Schmink illegally changed Chief Doyle's processes and procedures, which involved more and more computer-generated work that Chief Doyle had not previously done.

400.   When Chief Doyle became the Town's Fire Inspector and member of the Board of
       Engineers, his work location (Central Fire Station) did not even have a computer.

401.   The Town never provided Chief Doyle with any training on the use of computers or
       computer programming.

402.   The Town failed to provide Chief Doyle with a copy of his Job Description, for either
       position he held.

403.   Asst. Police Chief Schmink began usurping Chief Doyle's authority, not just by illegally
       acting as the purported Emergency Services Director, but also by breaking the Rockport
       Fire Department's chain of command and delegating responsibilities and tasks to one of
       Chief Doyle's Assistant Fire Chief's, Stephen Abell.

404.   Asst. Police Chief Schmink did so, because he wanted Asst. Police Chief Abell to be the
       first-ever full time Rockport Fire Chief; rather than Chief Doyle, in-part because of his
       much younger age.

405.   Chief Doyle, for more than twenty (20) years never received any counseling or feedback
       on his process and procedures, as Fire Inspector, in regard to his recordkeeping until less
       than three-months before he was placed on administrative leave on November 10, 2020.

406.   Chief Doyle, for the first time in more than twenty (20) years was informed by his
       illegally appointed supervisor that in his opinion and that of an accountant who
       conducted the October 7, 2020, audit, he need to improve his processes and procedures in
       regards to Fire Inspector recordkeeping, but was never offered any assistance or training
       in improving the processes and procedures.

407.   Prior to the Town's illegal appointment of Chief Doyle's purported but unlawful
       supervisors (Town Admin. Vieira as Public Safety Commissioner and Asst. Police Chief

as Emergency Services Director), Chief Doyle never received any job warnings or criticisms related to his Fire Inspector processes or procedures, in fact it only occurred shortly before he was placed on administrative leave on November 10, 2020.

408.   The Town and its illegally appointed agents (Town Admin. Vieira as Public Safety Commissioner and Asst. Police Chief as Emergency Services Director) wrongfully terminated Chief Doyle ten (10) months before his mandatory retirement age, so that the defendants could take their next steps in attempting to make the Rockport Fire Department full time and make Asst. Chief Abell its Fire Chief.

409.   As a direct and proximate result of Defendants actions, Chief Doyle has suffered serious and substantial injury and loss, including loss of reputation, indignity, mental suffering and distress, inconvenience and expenditure of time in defending litigation, attorneys' fees and costs incurred, loss of money, and loss of his employment with the Town of Rockport.

### Count XVII - Due Process Violation – 42 U.S.C. § 1983
*Chief Doyle v. Defendants Town, and Selectmen*

410.   Plaintiff incorporates the preceding paragraphs as if they were expressly stated herein.

411.   Public employees have due process rights associated with their continued employment.

412.   Public employees have the right to a termination hearing, and to be heard at said termination hearing, prior to being terminated.

413.   The Selectmen decided long before the Termination Hearing was held, to terminate Chief Doyle, as indicated by their pre-prepared statements which all similarly were used to terminate Chief Doyle.

414.   Chief Doyle's rights to due process were violated by the Selectmen's predetermined decisions that were made before Chief Doyle was heard.

415.   As a direct and proximate result of Defendants actions, Chief Doyle has suffered serious and substantial injury and loss, including loss of reputation, indignity, mental suffering and distress, inconvenience and expenditure of time in defending litigation, attorneys' fees and costs incurred, loss of money, and loss of his employment with the Town of Rockport.

**Count XVIII - Violation of the Massachusetts Civil Rights Act - G.L. c. 12, § 11I**
*Chief Doyle v. Defendants Vieira, Schmink, Town, and Selectmen*

416.   Plaintiff incorporates the preceding paragraphs as if they were expressly stated herein.

417.   Public employees have due process rights associated with their continued employment.

418.   Public employees have the right to a termination hearing, and to be heard at said termination hearing, prior to being terminated.

419.   The Selectmen decided long before the Termination Hearing was held, to terminate Chief Doyle, as indicated by their pre-prepared statements which all similarly were used to terminate Chief Doyle.

420.   Chief Doyle's rights to due process were violated by the Selectmen's predetermined decisions that were made before Chief Doyle was heard.

421.   As a direct and proximate result of Defendants actions, Chief Doyle has suffered serious and substantial injury and loss, including loss of reputation, indignity, mental suffering and distress, inconvenience and expenditure of time in defending litigation, attorneys' fees and costs incurred, loss of money, and loss of his employment with the Town of Rockport.

**Count XIX - Civil Conspiracy**
*Chief Doyle v. Defendants Vieira, Horvath, Schmink, Silva, Campbell, and Wilkinson*

422.   Plaintiff incorporates the preceding paragraphs as if they were expressly stated herein.

423. Defendants acted in concert, pursuant to an agreement, to injure Chief Doyle.

424. Starting in 2019, as the Selectmen appointed Defendants Vieira and Schmink to paid positions that were completely in violation of Massachusetts Law, Defendant Vieira illegally hired Defendant Horvath's spouse, Attorney Dinamary Horvath to investigate Chief Doyle for a non-terminable offense which he admitted to.

425. Despite no investigation being necessary, for something Chief Doyle admitted to (and Town Admin. Vieira agreed with), Defendant Vieira hired his direct report's spouse to investigate Chief Doyle for several months.

426. The investigation led to a purported Last Chance Agreement, but Defendants have failed to disclose Attorney Horvath's internal investigation report.

427. At the same time, Defendant Vieira is appointed as the illegal Public Safety Commissioner and Defendant Schmink is appointed as the illegal Emergency Services Director in order to illegally usurp Chief Doyle's authority and to begin making the volunteer Rockport Fire Department, full-time.

428. At the same time, Defendants Vieira, Schmink, and Wilkinson ensure that then LT Stephen Abell is appointed to the Board of Engineers, as this is who they wanted to become RFD's first ever full-time Fire Chief.

429. As tensions rose between the RFD and Town Hall, and the volunteer firefighters' morale plummeted, Defendants Vieira and Schmink begin to unlawfully pressure Chief Doyle for work product he never had to previously generate, nor was ever trained to generate in order to create a pretext for getting rid of him.

430.   Chief Doyle was notified that third-party accountant was scheduled to audit the Fire Inspector's records on the same day Defendant Horvath first communicated with Defendant Edith Silva.

431.   Defendant Edith Silva met with, spoke with, and otherwise communicated with Police Chief Horvath, but failed to mention these material facts in her sworn affidavit filed with the Court.

432.   Police Chief Horvath had no reason to believe probable cause of a crime existed; nevertheless, he chose to use his authority to prompt an investigation by the Massachusetts State Police, on the same day that his direct supervisor (Town Admin. Vieira) and his direct report (Asst. Police Chief Schmink) scheduled the aforementioned audit/review of Chief Doyle's Fire Inspector records.

433.   Police Chief Horvath unlawfully detained Chief Doyle in order to further cause him distress on the same day that Chief Horvath's Supervisor (Town Admin. Vieira) and his direct report (Asst. Police Chief Schmink) arranged for Chief Doyle to be audited by a third-party.

434.   These actions were intentional and done to distress Chief Doyle so he would underperform during the audit, giving Chief Horvath's Supervisor (Town Admin. Vieira) and his direct report (Asst. Police Chief Schmink) purported cause to terminate Chief Doyle.

435.   Despite the Massachusetts State Police notifying Police Chief Horvath and Asst. Police Chief Schmink (who in turn notified their collective boss, Town Admin. Vieira) that the Massachusetts State Police concluded nothing criminal or even improper occurred in relation to Defendant Edith Silva's defamatory accusations, Police Chief Horvath spoke

to Defendant Edith Silva prior to the hearing on her Complaint for a Harassment
Prevention Order.

436.  This conversation occurred over two months after Defendant Edith Silva first met with
Police Chief Horvath, and contemporaneous with Town Admin. Vieira sending Chief
Doyle his Termination Letter, which references a meeting where Town Admin. Vieira
told Chief Doyle that he was not satisfied with (which Police Chief Horvath was present
at).

437.  Police Chief Horvath urged Defendant Edith Silva to seek a Harassment Prevention
Order, whilst knowing that there was no probable cause or reasonable belief that anything
criminal or improper occurred, against Chief Doyle; which she did not do until two
months after the Massachusetts State Police closed their investigation, but within twenty-
four (24) hours of Town Admin. Vieira's Termination Letter being served on Chief
Doyle which scheduled his Termination Hearing.

438.  Town Admin. Vieira, Police Chief Horvath, and Asst. Police Chief Schmink, during
relevant times herein, communicated using an email encryption software for no justifiable
reason.

439.  Defendants have refused to provide any more information or copies of these encrypted
emails but have confirmed that Chief Doyle's name does appear within the encrypted
emails.

440.  Defendants herein acted in concert, with a common design, with the eventual goal of
pressuring Chief Doyle to retire, but when that was not successful, they ensured he would
be wrongfully terminated.

441.    As a direct and proximate result of Defendants actions, Chief Doyle has suffered serious

and substantial injury and loss, including loss of reputation, indignity, mental suffering

and distress, inconvenience and expenditure of time in defending litigation, attorneys'

fees and costs incurred, loss of money, and loss of his employment with the Town of

Rockport.

**WHEREFORE**, the Plaintiff respectfully requests that this Honorable Court grant the following relief against the defendants:

a)  Enter Judgment on all counts in Plaintiff's favor and against all Defendants.
b)  Award any and all damages the Plaintiff is entitled to for each respective count, in an amount that will fairly and adequately compensate Plaintiff for each of the Defendants' respective actions.
c)  Award reasonable attorneys' fees and costs to Plaintiff.
d)  Award punitive damages against Defendants.
e)  Declare the purported Last Chance Agreement *void ab initio*.
f)  Issue injunctive relief to restrain the continued violations of Massachusetts Law and for the reinstatement of Chief Doyle.
g)  Any such other and further relief as the Court deems just and proper.

### PLAINTIFF DEMANDS TRIAL BY JURY

Respectfully submitted,
**JAMES "JIMMY" DOYLE,**
By his attorney,

*/s/ Liam T. O'Connell*
Liam T. O'Connell, BBO # 694477
Farrell Smith O'Connell
46 Middle Street, Second Floor
Gloucester, MA 01930
(978) 309-9243
(978) 231-8303
loconnell@fsofirm.com

**<u>CERTIFICATE OF SERVICE</u>**

I, Liam T. O'Connell, hereby certify that there have been
no appearances filed yet in this matter; thus, there is no one to serve.

*<u>/s/ Liam T. O'Connell</u>*
Liam T. O'Connell, Esq.